Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| MARÍA DEL CARMEN CORDERO MARTÍNEZ<br><br>Recurrente<br><br>V.<br><br>DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN<br><br>Recurrido | TA2025RA00336 | *Revisión Administrativa* Procedente de la Institución Complejo para la Rehabilitación de Mujeres del Departamento de Corrección y Rehabilitación<br><br><br>Sobre: Revisión de Custodia |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Juez Barresi Ramos y la Jueza Santiago Calderón.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de abril de 2026.

Comparece ante nos, la Sra. María Del Carmen Cordero Martínez ("señora Cordero Martínez" o "Recurrente") y solicita que revisemos la *Resolución* emitida el 14 de agosto de 2025,[1] por el Comité de Clasificación y Tratamiento ("CCT") del Departamento de Corrección y Rehabilitación ("DCR"). En la aludida resolución, el CCT acordó reclasificar a la **Recurrente** de custodia mínima a custodia máxima.

Oportunamente, la **señora Cordero Martínez** solicitó la reconsideración de la determinación,[2] sin embargo, la reclasificación a custodia máxima fue sostenida.[3]

Por los fundamentos que expondremos, **confirmamos** la *Resolución* recurrida.

---

[1] Surge del expediente que el 14 de agosto de 2025 el Comité de Clasificación y Tratamiento se reunió y emitió la resolución recurrida.
[2] La solicitud de reconsideración fue sometida el 29 de agosto de 2025.
[3] La *RESPUESTA DE RECONSIDERACIÓN SOBRE CUSTODIA* fue emitida el 9 de septiembre de 2025 y recibida por la recurrente el 22 de septiembre de 2025.

**-I-**

De los autos surge, que el **CCT** se reunió el **14 de agosto de 2025**, con el propósito de evaluar a la **señora Cordero Martínez**.[4] **En igual fecha**, emitió una *Resolución*,[5] en la cual realizó las siguientes determinaciones de hechos:

1. *El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo emitió sentencia en el caso criminal CSC2023G0469 por Art 404 Ley 4 de tres (3) años de cárcel concurrente con los casos CSC2023G[0]467, CSC2023G0468 y CSC2023G0470 y consecutivos con CSC2023G0460 y CSC2023G0461. Se exime del pago de pena especial.*

2. *El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo emitió sentencia en el caso criminal CSC2023G0467 por Art 404 Ley 4 enmendado a Art 406 Ley 4 (modalidad conspiración) de tres (3) años de cárcel concurrente con los casos CSC2023G[0]469, CSC2023G0468 y CSC2023G0470 y consecutivos con CSC2023G0460 y CSC2023G0461. Se impone pago de pena especial de $300.00.*

3. *El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo emitió sentencia en el caso criminal CSC2023G0461 por Art 401 Ley 4 enmendado a Art 406 Ley 4 (modalidad conspiración) de tres (3) años de cárcel concurrente con el caso CSC2023G0460 y consecutivo con CSC2023G[0]467, CSC2023G0468, CSC2023G0469 y CSC2023G0470. Se impone pago de pena especial de $300.00.*

4. *El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo emitió sentencia en el caso criminal CSC2023G0468 por Art 401 A.2 Ley 4 enmendado a Art 406 Ley 4 modalidad conspiración de tres (3) años de cárcel concurrente con CSC2023G0467, CSC2023G[0]469 y CSC2023G0470 y consecutivos con CSC2023G0460 y CSC2023G0461. Se exime del pago de pena especial.*

5. *El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo emitió sentencia en el caso criminal CSC2023G[0]470 por Art 412 Ley 4 de tres (3) años de cárcel concurrente con CSC2023G0467, CSC2023G0468 y CSC2023G0469 y consecutivos con CSC2023G0460 y CSC2023G0461. Se exime del pago de pena especial.*

6. *El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo emitió sentencia en el caso criminal CSC2023G0460 por Art 401 Ley 4 enmendado Art 406 Ley 4 modalidad conspiración de tres (3) años concurrentes con CSC2023G0461 y consecutivos con CSC2023G0467, CSC2023G0468, CSC2023G0469 y CSC2023G0470.*

7. *El 20 de agosto de 2024 el Comité de Clasificación y Tratamiento acordó en su reunión clasificar inicialmente en custodia MÍNIMA.*

8. *El 20 de septiembre de 2024 el Comité de Clasificación y Tratamiento acordó en su reunión asignar a rendir labores como Servidor de Alimentos.*

9. *El 27 de septiembre de 2024 el Comité de Clasificación y Tratamiento acordó en su reunión asignar al curso vocacional Diseño de Alta Moda.*

---

[4] Véase, *Resolución* emitida por el CCT el 14 de agosto de 2025, Apéndice 3 de la Entrada Núm. 1 del caso TA2025RA00336 en SUMACTA, a la pág. 3.
[5] Véase, Apéndice 3 de la Entrada Núm. 1 del caso TA2025RA00336 en SUMACTA, a las págs. 3-7.

10. *El 12 de noviembre de 2024 recibió certificado bautismal.*

11. *El 20 de diciembre de 2024 la Sra. Carol Rodríguez #3624, Trabajadora Social de Physician Correctional emitió certificación de no ameritar terapia para la Transformación de Patrones Adictivos ni terapia para la Regulación del Coraje y Control de Impulsos.*

12. *El 12 de febrero de 2025 se discutió caso con Técnico de Servicios Sociopenales de José Díaz, pareja de la confinada para auscultar posibilidad de visita especial. La misma no fue recomendada.*

13. *El 20 de febrero de 2025 se otorgó certificado de reconocimiento por haber participado en "Competencia de Costura".*

14. *El 21 de febrero de 2025 J. Santiago, Oficial Correccional realiza informe negativo relacionado a mal uso del taller de cocina.*

15. *El 21 de febrero de 2025 se radicó querella disciplinaria por actos prohibidos 101 Abandono de trabajo y/o grupo y/o actividad, 148 Documento, carta, comunicación clandestina, 200 Contrabando, 208 Estar en área no autorizada y 222 Abuso o mal uso de privilegios.*

16. *El 8 de abril de 2025 se encontró incursa en querella disciplinaria por violación a los actos prohibidos 101 Abandono de trabajo y/o grupo y/o actividad, 148 Documento, carta, comunicación clandestina, 208 Estar en área no autorizada y 222 Abuso o mal uso de privilegios. Fue sancionada a la privación de privilegios de recreación activa, actividades especiales, comisaria, visita y cualquier otro tipo de privilegio por un [término] de setenta (70) días calendario.*

17. *El 23 de abril de 2025 el Comité de Clasificación y Tratamiento acordó en su reunión dar de baja de labores como Servidor de Alimentos tras surgir informe negativo y encontrarse incursa en querella disciplinaria por incidente durante labores.*

18. *El 5 de mayo de 2025 recibió certificado de participación en Actividad Educativa: "Prevención del Suicidio".*

19. *El 21 de mayo de 2025 recibió certificado de reconocimiento por desempeño académico, conducta, superación, cooperación y ser estudiante tutor durante el año escolar 2024-2025.*

20. *El 9 de julio de 2025 el Comité de Clasificación y Tratamiento acordó en su reunión asignar a rendir labores en Brigada interna de Trimmers.*

21. *Actualmente se encuentra incursa en querella disciplinaria.*

22. *Continúa cursando estudios vocacionales en Diseño de Alta Moda.*

23. *Ha participado de actividades educativas y religiosas a la libre comunidad.*

24. *Se desprende del expediente criminal haber extinguido mínimo de sentencia el 29 de abril de 2025 y que extinguirá el máximo de sentencia el 9 de enero de 2028 tentativamente.*[6]

Así las cosas, el **CCT** acordó reclasificar la custodia de la recurrente de mínima a máxima.[7] En lo pertinente, determinó que:

---

[6] *Íd.*, a las págs. 3 – 5.
[7] *Íd.*, a la pág. 7.

*[L]a confinada en referencia extingue sentencia por seis (6) casos de la Ley de Sustancias Controladas. El 15 de julio de 2024 el Tribunal de Primera Instancia de Arecibo impuso <u>una sentencia global de 6 años; de los cuales ha cumplido con 1 año y 20 días</u>. Debido a la severidad de los delitos, <u>el 20 de agosto de 2024 fue clasificada inicialmente en custodia mínima</u>. En la actualidad, cursa estudios vocacionales de Diseño de Alta Moda con buenas evaluaciones y ejerce labores en Brigada interna de Trimmers donde su desempeño continua bajo observación dado al corto tiempo al que se encuentra integrada. <u>Durante el periodo evaluado muestra cumplimiento de ajustes institucionales inconsistentes</u>. El pasado 20 de diciembre de 2024 Physician Correctional emitió certificación en la que indica que la confinada no requiere recibir terapias para la transformación de patrones adictivos ni para la regulación del coraje y control de impulsos. <u>La confinada alega no ser consumidora de sustancias controladas, pero con la cantidad de casos criminales a los cuales fue sentenciada, relacionados a sustancias controladas se pudiera identificar una problemática en el tema y la necesidad de tratamiento</u>. Por otra parte, <u>el 8 de abril de 2025 se encontró incursa en querella disciplinaria tras incurrir en los actos prohibidos: 101 Abandono de trabajo y/o grupo y/o actividad, 148 Documento, carta, comunicación clandestina, 208. Estar en área no autorizada y 222 Abuso o mal uso de privilegios</u>. Ante la presencia de los actos mencionados anteriormente, <u>la confinada demuestra carecer de interés en su proceso de rehabilitación. Se recomienda integración a un nivel de máximas restricciones en el que será evaluada rigurosamente con el fin de que pueda evidenciar cambios positivos y posteriormente pueda ser considerada al nivel de mínimas restricciones donde se encontraba</u>.* [sic].[8]

Inconforme, la **Recurrente** instó el **29 de agosto de 2025**, un *Proceso de Reconsideración de Clasificación de Custodia*.[9] Sin embargo, la reconsideración no fue acogida por la Supervisora del **CCT**.[10]

No conforme con la determinación, la **señora Cordero Martínez** recurrió ante este Foro Apelativo.[11] Mediante el *Escrito de Revisión Judicial* con fecha del **8 de octubre de 2025**, y presentado en la Secretaría de este Tribunal el **29 de octubre de 2025**, la **Recurrente** no señaló la comisión de error alguno. Ahora bien, por su escrito inferimos que no está de acuerdo con la reclasificación de máxima custodia.

---

[8] *Íd.*, a las págs. 6 – 7. *Subrayado nuestro.*

[9] Véase, Anejo I de la Entrada Núm. 4 del caso TA2025RA00336 en SUMACTA, a las págs. 4-6.

[10] La determinación fue emitida el 9 de septiembre de 2025, y fue notificada a la recurrente el 22 de septiembre de 2025. Véase, Anejo I de la Entrada Núm. 4 del caso TA2025RA00336 en SUMACTA, a las págs. 1-3.

[11] Entrada Núm. 1 del caso TA2025RA00336 en SUMACTA.

En cumplimiento de nuestra *Resolución*,[12] el **8 de diciembre de 2025**, por conducto de la Oficina del Procurador General, el **DCR** sometió un *ESCRITO EN CUMPLIMIENTO DE RESOLUCIÓN*.[13]

Habiendo comparecido las partes de epígrafe, el **12 de diciembre de 2025**,[14] dimos por sometido el recurso para la consideración del Panel.[15]

-II-

-A-

Conforme al Artículo 4.006 inciso (c) de la *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico*, el Tribunal de Apelaciones tiene competencia apelativa para revisar las decisiones, órdenes y resoluciones finales emitidas por las agencias administrativas.[16] Cónsono con lo anterior, nuestra facultad revisora delimita la discreción de los organismos administrativos a modo de asegurar que estos ejerzan sus funciones dentro de los márgenes de las facultades que le fueron delegadas por ley.[17] Además, permite a los foros judiciales velar que los entes administrativos den cumplimiento a los mandatos constitucionales, en especial, al debido proceso de ley.[18]

Por su parte, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* ("LPAU") establece el marco de revisión judicial de estas decisiones.[19] En el ejercicio de tal facultad, este foro apelativo está obligado a ser deferente con las determinaciones de los organismos administrativos en consideración a la experiencia y

---

[12] Véase, *Resolución* emitida el 6 de noviembre de 2025 notificada el 7 de noviembre de 2025. Entrada Núm. 3 del caso TA2025RA00336 en SUMACTA.
[13] Entrada Núm. 4 del caso TA2025RA00336 en SUMACTA.
[14] Notificada el 15 de diciembre de 2025.
[15] Entrada Núm. 5 del caso TA2025RA00336 en SUMACTA.
[16] Artículo 4.006 inciso (c) de la Ley Núm. 201-2003, según enmendada, conocida como la *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003*, 4 LPRA sec. 24y inciso (c).
[17] *Vázquez v. Consejo de Titulares*, 2025 TSPR 56, 215 DPR ___ (2025); *Torres Rivera v. Policía de PR*, 196 DPR 606, 625-626 (2016).
[18] *Capote Rivera v. Voili Voila Corporation*, 213 DPR 743, 753 (2024).
[19] Sección 4.5 de la Ley Núm. 38-2017, según enmendada, conocida como la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, 3 LPRA sec. 9675.

al conocimiento especializado que estas poseen sobre los asuntos que le fueron delegados.[20] Sin embargo, ello no equivale a una renuncia de la función revisora de los tribunales.[21]

La revisión judicial no implica una nueva valoración de la evidencia ni sustituye la función de la agencia, sino que se limita a garantizar que las agencias actúen dentro de las facultades otorgadas por ley y conforme a derecho.[22] De hecho, el Tribunal Supremo de Puerto Rico ha reiterado que las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal.[23]

Así pues, la revisión judicial de una decisión administrativa se circunscribe a determinar si hay evidencia sustancial en el expediente para sostener la conclusión de la agencia o si esta actuó de forma arbitraria, caprichosa o ilegal.[24] A esos efectos, la revisión judicial comprende tres (3) aspectos: **(i)** la concesión del remedio apropiado; **(ii)** la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial; y **(iii)** la revisión completa y absoluta de las conclusiones de derecho.[25] En cuanto a las determinaciones o conclusiones de derecho, el Tribunal Supremo de Puerto Rico ha reiterado que el tribunal las puede revisar en todos sus aspectos, sin sujeción a norma o criterio alguno.[26]

En fin, este proceso de revisión judicial busca equilibrar la deferencia hacia las agencias administrativas, debido a su especialización, con la necesidad de garantizar que sus decisiones sean legales y razonables.[27]

---

[20] *Íd.*; *Super Asphalt v. AFI y otro*, 206 DPR 803 (2021); *Vázquez v. Consejo de Titulares*, *supra.*
[21] *Vázquez v. Consejo de Titulares*, *supra*, a la pág. 17.
[22] *Oficina de Ética Gubernamental v. Martínez Giraud,* 210 DPR 79, 88 (2022); *Hernández Feliciano v. Mun. De Quebradillas*, 211 DPR 99 (2023).
[23] *Vázquez v. Consejo de Titulares*, *supra*, a las págs. 13, 17.
[24] 3 LPRA sec. 9675.; *Vázquez v. Consejo de Titulares*, *supra.*; *Super Asphalt v. AFI y otro*, *supra.*
[25] *Íd.*
[26] 3 LPRA sec. 9675.; *Vázquez v. Consejo de Titulares*, *supra.*
[27] *Vázquez v. Consejo de Titulares*, *supra.*

**-B-**

Ahora bien, en el contexto de las determinaciones administrativas sobre el nivel de custodia, el Máximo Foro Judicial de Puerto Rico ha expresado que: *"[a]l momento de determinarse la procedencia de un cambio en el nivel de custodia, deberá considerarse una serie de factores subjetivos y objetivos, para cuya atención se requiere la pericia* [del Departamento de Corrección y Rehabilitación]*"*.[28]

La Sección 19 del Artículo VI de la Constitución de Puerto Rico establece que: *"[s]erá política pública del Estado Libre Asociado* [...] *reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los* [confinados] *para hacer posible su rehabilitación moral y social"*.[29]

Para viabilizar el mandato constitucional de propender la rehabilitación moral y social de las personas confinadas a los fines de fomentar su reincorporación a la sociedad,[30] la Asamblea Legislativa de Puerto Rico aprobó el *Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011* ("Plan de Reorganización de 2011").[31] Mediante el referido estatuto se le confirió al **DCR** el deber de clasificar de forma adecuada y revisar de forma continua los confinados, conforme a los ajustes y cambios de esta, e integrar y dar participación a la comunidad penal, sus familiares, personal correccional y las víctimas del delito en el diseño, implantación y evaluación periódica de los sistemas de clasificación y de los programas de rehabilitación.[32]

---

[28] *Cruz v. Administración*, 164 DPR 341, 352 (2005).
[29] Art. VI, Sec. 19, Const. PR, LPRA, Tomo 1.; *Cruz Negrón v. Adm. De Corrección*, *supra*, a la pág. 351.
[30] Véase, Art. VI, Sec. 19, Const. PR, LPRA, Tomo 1.
[31] Artículo 2 del Plan de Reorganización Núm. 2 de 21 de noviembre de 2011, según enmendado, conocido como *Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011*, 3 LPRA Ap. XVIII, Art. 2.
[32] 3 LPRA Ap. XVIII, Art. 5 incisos (a) y (b).

Así pues, la población correccional es evaluada periódicamente con el propósito de conocer y analizar su situación social, física, emocional y mental, historial delictivo e identificar sus capacidades, intereses, motivaciones, controles y limitaciones, a los fines de clasificarlos y determinar el plan de acción a tomar en cada caso.[33] A esos efectos, clasifican y determinan el plan de acción a tomar en cada caso, en armonía con los principios de tratamiento individualizado y seguridad pública enmarcados en los propósitos del **Plan de Reorganización de 2011**.[34]

En ese sentido, el *Manual para la Clasificación de los Confinados* ("Manual para la Clasificación"),[35] tiene como propósito indicar cuales son los procedimientos para la revisión del nivel de custodia de cada confinado con el fin de determinar cuán apropiada es la asignación de custodia actual.[36] El responsable de evaluar las necesidades de seguridad y los programas de las personas confinadas que han sido sentenciadas es el **CCT**.[37] Trazando como objetivos la rehabilitación y la seguridad pública.[38]

Cabe mencionar, que la reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o la vivienda asignada; y cuya función principal es verificar la adaptación de la persona confinada y prestarle atención a cualquier situación que pueda surgir.[39] La revisión de custodia para las personas confinadas dependerá del nivel de custodia en que se encuentre, ya sea mínima y mediana —cada 12 meses— o máxima —cada 6 meses—.[40]

---

[33] 3 LPRA Ap. XVIII, Art. 10.
[34] *Íd.*
[35] *Manual para la Clasificación de los Confinados*, Reglamento Núm. 9151 de 22 de enero de 2020.
[36] *Íd.*, Sección 7.
[37] *Íd.*, Sección 2 (IV)(A), a la pág. 19.
[38] *Íd.*
[39] *Íd.*, Sección 7 (II), a la pág. 48.; *Cruz Negrón v. Administración, supra*, a la pág. 352.
[40] *Manual para la Clasificación de los Confinados, supra*, Sección 2 (V)(D), a las págs. 23–24.

Conforme a ello, el **Manual para la Clasificación** establece los siguientes ocho (8) criterios objetivos para determinar el grupo en el que se ubicará al confinado a los que se asigna una ponderación numérica fija, a saber: **(1)** gravedad de los cargos y sentencias actuales; **(2)** historial de delitos graves previos; **(3)** historial de fuga o tentativa de fuga; **(4)** número de acciones disciplinarias; **(5)** acciones disciplinarias previas serias; **(6)** sentencias anteriores por delitos graves como adulto en los últimos cinco años; **(7)** participación en programas/tratamientos, y **(8)** edad al momento de la evaluación.[41] Al momento de asignar una puntuación, la escala provee algunos criterios adicionales que son discrecionales y no discrecionales para determinar el grado de custodia a recomendar.[42]

Si una persona confinada no está de acuerdo con la determinación del **CCT**, esta tiene disponibles mecanismos de revisión, incluyendo presentar un recurso ante este Tribunal Apelativo.[43]

### -III-

Aunque la **señora Cordero Martínez** no señaló la comisión de errores, intimamos que en su escrito cuestiona la reclasificación de su custodia. Parece argüir que el **CCT** debió reclasificar su custodia a mediana, ya que el resultado total obtenido correspondía a una de custodia mediana, y no a una de custodia máxima, como fue reclasificada.

Por su parte, el **DCR** argumenta que el **CCT** actuó conforme al expediente y al derecho aplicable, por lo que no debemos sustituir la determinación ante ausencia de irrazonabilidad, arbitrariedad o evidencia en el expediente que revoque su presunción de legalidad y corrección.  Tiene razón.

---

[41] *Manual para la Clasificación de los Confinados, supra,* Apéndice K.
[42] *Íd.*
[43] *Manual para la Clasificación de Confinados, supra,* Sección 7 (V)(A), a las págs. 54 – 56.

Primeramente, según la *Resolución* recurrida, la **Recurrente** está cumpliendo una sentencia global de 6 años, por varios casos de la Ley de Sustancias Controladas, de los cuales ha cumplido 1 año y 20 días. Surge, además, que el 21 de febrero de 2025, el Oficial Correccional J. Santiago le realizó un informe negativo a la **señora Cordero Martínez** relacionado al mal uso del taller de cocina, y, en consecuencia, se radicó en su contra una querella disciplinaria por violación a los Códigos: **(101) - Abandono de Trabajo, Grupo o Actividad**; **(148) - Documento, Carta, Comunicación Clandestina**; **(200) - Contrabando**; **(208) - Estar en Área No Autorizada** y **(222) - Abuso o Mal Uso de Privilegios** del Reglamento Núm. 9221 del 8 de octubre de 2020.[44] Por ello, el 8 de abril de 2025, la **Recurrente** fue encontrada incursa y fue sancionada por los Códigos (101), (148), (208) y (222).

Posteriormente, el nivel de custodia de la **señora Cordero Martínez** fue evaluada bajo los criterios de la *ESCALA DE*

---

[44] En lo pertinente, los **Actos Prohibidos del Nivel I** eran los siguientes Códigos:

**(101)  *Abandono de Trabajo, Grupo o Actividad* -** Aquel miembro de la población correccional que forma parte de una brigada, grupo, equipo de trabajo, deporte, cualquier actividad recreativa, artística o cultural, que desaparezca, se mueva o no se encuentre en el área designada, sin la autorización o conocimiento del oficial correccional o persona designada con autoridad.

**(148) *Documento, Carta, Comunicación Clandestina* -** Se prohíbe poseer cualquier documento, carta o comunicación clandestina dentro de la institución. Se entenderá por documento, carta o comunicación clandestina toda correspondencia que no tenga iniciales de algún empleado o funcionario autorizado de la institución, y la cual se encuentre en la posesión del miembro de la población correccional; cuyo contenido, además afecte directa o indirectamente la seguridad institucional. Se considerará comunicación clandestina, sin limitarse a esto, cualquier documento, libreta, listado que contenga información referente a deudas y artículos de miembro de la población correccional.

En lo pertinente, los **Actos Prohibidos del Nivel II** eran los siguientes Códigos:

**(200) *Contrabando* -** Consiste en la posesión de artículos o materiales considerados no peligrosos, que no sean suministrados o autorizados por el Departamento de Corrección y Rehabilitación. También se considerará contrabando aquellos artículos en exceso de los permitidos en el área de vivienda, tales como los artículos de consumo, o cualquier otro establecido por el Departamento de Corrección y Rehabilitación, excluyendo aquellos tipificados como contrabando peligroso.

**(208) *Estar en Área No Autorizada* -** Encontrarse o reunirse en un lugar dentro de la institución en el cual el miembro de la población correccional no ha sido autorizado a estar o le está prohibido encontrarse. Incluye:

a. Ausentarse, sin justificación alguna, del área en la que le corresponde estar o en la vivienda, cama o celda asignada por el Departamento de Corrección y Rehabilitación.

b. Encontrarse fuera de su área de vivienda sin su identificación de miembro de la población correccional;

c. Reunirse con otra persona en cualquier lugar dentro o fuera de la institución, sin autorización alguna,

d. entre otros.

**(222) *Abuso o Mal Uso de Privilegios* -** Consiste en el abuso, arbitrariedad, atropello, extralimitación o mal uso de privilegios concedidos mediante reglamentación por el Departamento de Corrección y Rehabilitación.

*Véase*, Regla 15 y 16 del *REGLAMENTO PARA ESTABLECER EL PROCEDIMIENTO DISCIPLINARIO DE LA POBLACIÓN CORRECCIONAL*, Reglamento Núm. 9221, 8 de octubre de 2020, a las págs. 26, 38,40,41-42, 44.

*RECLASIFICACIÓN DE CUSTODIA (CASOS SENTENCIADOS),* ("Escala").[45] Allí, obtuvo la siguiente puntuación:

| Evaluación de Custodia | Evaluación de la Recurrente | Puntuación |
|---|---|---|
| 1. Gravedad de los Cargos/ Sentencia Actuales | Moderada | 2 |
| 2. Historial de delitos grave previos | Ninguna/Baja | 0 |
| 3. Historial de fuga o tentativas de fuga | Ninguna Fuga o tentavia | 0 |
| Puntuación de Custodia | Subtotal | **2** |

| 4. Número de acciones disciplinarias | Tres o más | 6 |
|---|---|---|
| 5. Acciones disciplinarias previas serias | Nivel I | 7 |
| 6. Sentencias anteriores por delitos graves como adulto- ultimo cinco años | Ninguna | 0 |
| 7. Participación en programas/ tratamientos | Matriculado/participó por 6 meses | -1 |
| 8. Edad Actual | 40 años o más | -2 |
| | Subtotal | **10** |

| **Puntuación total de custodia** | | **12** |
|---|---|---|

Nótese, que según la Escala, la **Recurrente** obtuvo una **puntuación total de custodia de 12**. Al obtener más de 11 puntos en los renglones 1-8, en la parte **III. RESUMEN DE LA ESCALA Y RECOMENDACIONES**, le corresponde **UN NIVEL DE CUSTODIA DE MÁXIMA**.[46] Por lo que, conforme al total de criterios considerados en la evaluación de custodia de la *Resolución* recurrida, la **Recurrente** era acreditadora del **nivel máximo de custodia**. Tanto el **DCR** como el **CCT** tienen como objetivo la rehabilitación del confinado y la seguridad pública. Ante la falta de compromiso demostrada con su rehabilitación y las diversas faltas cometidas, la evaluación de custodia arrojó un elemento importante de riesgo a la seguridad institucional, por lo que acorde con la Escala, le corresponde a la **señora Cordero Martínez** una reclasificación de máxima custodia con el objetivo de ser evaluada para evidenciar cambios positivos que redunden en el beneficio de su rehabilitación.

---

[45] Apéndice 4 intitulado *ESCALA DE RECLASIFICACIÓN DE CUSTODIA (CASOS SENTENCIADOS)*, en la Entrada Núm. 1 del caso TA2025RA00336.
[46] *Íd.*

En conclusión, el **CCT** se basó en la información que obraba en el expediente ante su consideración, por lo que actuó correctamente al reclasificar a la **señora Cordero Martínez** a custodia máxima con el objetivo práctico de que esta evidencie cambios positivos, y a su vez, se salvaguarde la seguridad institucional. Al igual que el **CCT**, exhortamos a la **Recurrente** a que se beneficie de los talleres y servicios que le son brindados, para que pueda ser evaluada y reclasificada a un nivel inferior en un futuro próximo.

Por todo lo antes expuesto, confirmamos la determinación emitida por el **CCT**, ya que no es una arbitraria, ilegal o irrazonable que deba ser sustituida por nuestro criterio.

**-IV-**

Por los fundamentos antes expuestos, **confirmamos** la *Resolución* recurrida.

Lo acordó el Tribunal y certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones